IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| WISCONSIN CENTRAL LTD., *et al.* ) | |
| ) | Civil Action No. 1:23-CV-00291 |
| Plaintiffs, ) | |
| ) | |
| v. ) | |
| ) | |
| BROTHERHOOD OF MAINTENANCE OF ) | |
| WAY EMPLOYES DIVISION/IBT ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OF LAW IN SUPPORT OF
PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

I.  INTRODUCTION AND SUMMARY

In this case under the Railway Labor Act, 45 U.S.C. § 151, *et seq.* ("RLA"), the parties have a dispute over the proper interpretation of a recently negotiated letter of agreement (the "CN LOA") governing the payment of travel allowances and mileage expenses to certain employees represented by Defendant, the Brotherhood of Maintenance of Way Employes Division of the International Brotherhood of Teamsters ("BMWED"). Plaintiffs, Wisconsin Central LTD ("Wisconsin Central"), Illinois Central Railroad Company ("Illinois Central"), Grand Trunk Western Railroad Company ("GTW"), Chicago Central & Pacific Railroad Company ("CCP") and Bessemer and Lake Erie Railroad Company ("B&LE") contend that the CN LOA only provides travel allowances and mileage reimbursement to employees assigned to traveling gangs or whose assignments otherwise require them to stay overnight in a carrier-provided lodging facility. BMWED, on the other hand, contends that the CN LOA provides travel allowances and mileage reimbursement to *any* employee whose position does not have a fixed headquarters reporting

location, regardless of whether those positions require an employee to stay overnight away from home.

The parties' dispute in this case is a classic "minor dispute" under the RLA, since it can be resolved conclusively by interpreting the parties' collective bargaining agreements. As the Supreme Court and the Seventh Circuit have held time and time again, the "distinguishing feature" of a minor dispute "is that the dispute may be conclusively resolved by interpreting the existing agreement." *Consolidated Rail Corp. v. Railway Labor Execs.' Ass'n,* 491 U.S. 299, 305 (1989) ("*Conrail*"); *Chicago & North Western Transp. Co. v. Railway Labor Execs.' Ass'n*, 908 F.2d 144, 148 (7th Cir. 1990) ("*C&NW v. RLEA*") (a minor dispute "is one that can be resolved conclusively by interpretation of the collective bargaining agreement"). So long as Plaintiffs' position is "arguably justified" and is not "frivolous or obviously insubstantial," the dispute is minor and must be resolved through arbitration under the RLA. *Conrail*, 491 U.S. at 307; *Brotherhood of Loc. Eng'rs & Trainmen v. Union Pacific R.R. Co.*, 879 F.3d 754, 758 (7th Cir. 2017) ("*BLET v. UP*"); *Brotherhood of Maint. of Way Employes Div./IBT v. Norfolk Southern Ry. Co.*, 745 F.3d 808, 813 (7th Cir. 2014) ("*BMWED v. NS*").

As set forth more fully below, Plaintiffs' position that the CN LOA only provides travel allowances and mileage to specific employees – those on traveling gangs or whose jobs require them to stay overnight away from home – is supported by the plain language of the CN LOA, the recommendations of Presidential Emergency Board ("PEB") 250, and the agreement between the National Carriers' Conference Committee ("NCCC") and BMWED dated September 10, 2022 (the "2022 National Agreement") implementing those recommendations. At a minimum, Plaintiffs' position is at least "arguably justified" by the terms of the applicable agreements. And, it is crystal clear that the parties' competing interpretations of the CN LOA "can be resolved conclusively" by

2

interpretation of that agreement. That is all that is necessary for this Court to declare that the instant dispute is a minor dispute that must be resolved through arbitration under the RLA.

II. STATEMENT OF FACTS

Plaintiffs incorporate by reference the separate Statement of Material Facts submitted herewith.

III. ARGUMENT

    A. This Case Involves A Quintessential Minor Dispute Under The RLA That Must Be Resolved Through Arbitration.

The primary objectives of the RLA are to promote stability in labor relations in the railroad industry and prevent strikes. *See Detroit and Toledo Shore Line R.R. v. United Transp. Union*, 396 U.S. 142, 154 (1969); *Hawaiian Airlines, Inc. v. Norris*, 512 U.S. 246, 253 (1994) ("*Hawaiian Airlines*"); *BLET v. UP*, 879 F.3d at 755. To that end, the RLA established a dual framework for resolving disputes between a carrier and a rail labor organization.

Under the RLA's dual framework, disputes over the formation of a CBA or over efforts to change the terms of a CBA are classified as "major disputes." *Conrail*, 491 U.S. at 302. Major disputes "arise when there is no … agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy." *Conrail*, 491 U.S. at 302 (*quoting Elgin, Joliet & E. Ry. Co. v. Burley*, 325 U.S. 711, 723 (1945)). In other words, major disputes are "about creating new rights." *Brotherhood of Maint. of Way Employes v. Atchison, Topeka & Santa Fe Ry. Co.*, 138 F.3d 635, 638 (7th Cir. 1997) ("*BMWE v. ATSF*"); *BLET GCA UP v. Union Pacific R.R. Co.*, 988 F.3d 409, 412 (7th Cir. 2021) ("A major dispute arises from the creation of new contracts or modifications of existing contracts that affect any of the mandatory subjects of bargaining established in the RLA"). Such disputes are subject to "a lengthy and involved dispute resolution process during which the parties are obligated to maintain

3

the status quo." *Conrail*, 491 U.S. at 302-303; *BMWE v. ATSF*, 138 F.3d at 638; *see also* 45 U.S.C. §§ 152 Seventh, 155 and 156.

A minor dispute, by contrast, "contemplates the existence of a collective agreement already concluded" and "the dispute relates either to the meaning or proper application of a particular provision with reference to a specific situation or to an omitted case." *Conrail*, 491 U.S. at 303 (*quoting Burley*, 325 U.S. at 723). The characterization of a dispute as a "minor dispute" does not reflect the importance or value of the dispute. Rather, the term "minor dispute" reflects that the nature of the dispute is one over the interpretation or application of an existing agreement, rather than a dispute over the formation of, or changes to, an agreement. *Conrail*, 491 U.S. at 303-05; *BLET GCA UP*, 988 F.3d at 412. As noted above, the Supreme Court explained in *Conrail* that the "distinguishing feature" of a minor dispute "is that the dispute may be conclusively resolved by interpreting the existing agreement." *Conrail*, 491 U.S. at 305; *C&NW v. RLEA*, 908 F.2d at 148.

Section 3 of the RLA vests the National Railroad Adjustment Board ("NRAB"), or an arbitration panel known as a Public Law Board or Special Board of Adjustment ("PLB" or "SBA") established by the parties, with exclusive jurisdiction to resolve minor disputes. 45 U.S.C. § 153. These procedures are mandatory; a union may not strike over a minor dispute under the RLA. *Conrail*, 491 U.S. at 303-307; *BMWE v. ATSF*, 138 F.3d at 638.

"Congress charged the federal courts with a seminal but limited role under this regime-- that of taxonomist." *BMWE v. ATSF*, 138 F.3d at 638; *BLET v. UP*, 879 F.3d at 757. Courts are to "sort labor disputes into two piles, major or minor." *BMWE v. ATSF*, 138 F.3d at 638. In making the determination whether a dispute is minor, a court's role is limited to determining whether the carrier's position is "arguably justified" by the collective bargaining agreement, including

conditions implied therein by practice or course of dealing. *See Conrail*, 491 U.S. at 307. The carrier's burden in this respect is "relatively light;" so long as the carrier's position on the merits of the dispute is not "frivolous or obviously insubstantial," the dispute is minor. *Conrail*, 491 U.S. at 307; *BLET GCA UP*, 988 F.3d at 413; *BLET v. UP*, 879 F.3d at 758; *BMWED v. NS*, 745 F.3d at 813-14. "The court does not consider the merits of the underlying dispute; its role is limited to determining whether the dispute can be characterized as involving the proper application or meaning of a contract provision." *Railway Labor Exec's' Ass 'n v. Norfolk & Western Ry. Co.*, 833 F.2d 700, 704 (7th Cir. 1987). If the railroad "can articulate an argument that is 'neither obviously insubstantial or frivolous, nor made in bad faith,' the court lacks jurisdiction to do anything but dismiss the case and allow arbitration to go forward." *BLET v. UP*, 879 F.3d at 758 (*quoting Conrail*, 491 U.S. at 310); *BLET GCA UP*, 988 F.3d at 413. In view of the light burden a railroad bears under this scheme, the Seventh Circuit has emphasized, "in making the choice between major and minor, there is a large thumb on the scale in favor of minor, and hence arbitration." *BLET GCA UP*, 988 F.3d at 413 (*quoting BLET v. UP*, 879 F.3d at 758).

As the Seventh Circuit has further explained, sound policy reasons support the limited role of federal courts in minor disputes: "[r]eferring arbitrable matters to the Board will help to 'maintain agreements' by assuring that collective-bargaining contracts are enforced by arbitrators who are experts in 'the common law of [the] particular industry.'" *BMWED v. NS*, 745 F.3d at 815 (*quoting Conrail*, 491 U.S. at 310) (bracketed text in original).

Plaintiffs' position in this case is more than "arguably justified;" it is strongly supported by the plain language of the parties' agreements and clear legal authority. At a minimum, Plaintiffs' position cannot be characterized as "frivolous or obviously insubstantial."

5

The Seventh Circuit's decision in *BMWE v. ATSF* is directly on point and compels the conclusion that this case involves a minor dispute that must be resolved through arbitration. *BMWE v. ATSF*, 138 F.3d at 638-644. In that case, the Union filed suit seeking a declaration that the railroad defendants had abrogated a recently negotiated collective bargaining agreement with respect to the payment of travel expenses. The disputed language of the parties' agreement had been adopted from the report of PEB 229 and provided payments to employees based on the distance traveled from home. *Id.* at 640. The parties' dispute centered on whether this provision applied to all traveling employees, as the Union contended, or only to those employees who worked on regional or system gangs, as the railroads contended. The agreement itself only referred to "employees." However, the Seventh Circuit looked to the bargaining history, particularly the report of PEB 229, in which the PEB "explicitly linked the issue of travel allowances to regional and system gangs, not all traveling employees." *Id.* at 642. Accordingly, while the Court noted that the Union's interpretation was "plausible, maybe even probable," the Court found the dispute to be minor because the railroad's interpretation was at least "arguably justifiable" and not "frivolous." *Id.* at 643 (citing *Conrail*, 491 U.S. at 320).

Plaintiffs' position in this case is, if anything, stronger than the position of the railroads in *BMWE v. ATSF*. Nonetheless, the reasoning and analysis of the Seventh Circuit in that case is directly applicable here, and disposes of any claim that this case involves a major dispute. First, the plain language of the CN LOA strongly supports Plaintiffs' position. In that regard, paragraph 2 of the CN LOA specifically states, "This agreement only applies to employees who work on traveling gangs or perform work that requires staying overnight in a lodging facility. These CN employees are currently classified as 'Mobile.'" (Pls' Stmt. of Facts ¶ 23). Paragraph 3 of the CN LOA then ties the eligibility of "Mobile" employees as defined in the CN LOA to the 2022

6

National Agreement, stating, "Mobile employees are covered by the travel, lodging, meals and incidental expense reimbursement provisions *as stated in the national agreement* between the NCCC and BMWED (the 'national agreement')." (Pls' Stmt. of Facts ¶ 23). Article V of the 2022 National Agreement specifically states that it applies to "employees on traveling gangs who are assigned to work away from home." (Pls' Stmt. of Facts ¶ 13). Thus, the plain language of both the CN LOA and the 2022 National Agreement makes clear that the travel allowances provided under the CN LOA only apply to employees on traveling gangs or whose work requires them to stay overnight away from home.

This conclusion is bolstered by paragraph 4 of the CN LOA, which provides, "The terms below only apply to travel home during a work week or multiple day work assignment and do not affect reimbursement terms under the national agreement for mileage and expense reimbursement at the start and end of the work week or multiple-day work assignments." (Pls' Stmt. of Facts ¶ 23). By limiting the application of the agreement to "travel home during a work week or multiple day work assignment," this paragraph underscores that the CN LOA only applies to employees assigned to work away from home for period of time. This language cannot be read to provide a travel allowance to an employee holding a position that does not require him or her to stay overnight away from home.

Likewise, Paragraph 5 of the CN LOA further underscores that it only applies to employees assigned to work away from home. The first sentence of paragraph 5 provides, "A Mobile employee who chooses to drive home and forego overnight lodging and M&IE (meals and incidental expense) per diem during a work week or multiple day work assignment, … will be eligible for mileage reimbursement and travel allowance payment according to the following terms." (Pls' Stmt. of Facts ¶ 24). Again, the reference to driving home "during a work week or

7

multiple day work assignment" supports the conclusion that the travel allowances provided in the CN LOA are only available to those employees who are assigned to work away from home for a period of time. And, the "overnight lodging and M&IE (meals and incidental expense) per diem" that an employee would forego to be entitled to the travel allowance and mileage under the CN LOA plainly references the travel and lodging provisions in the 2022 National Agreement, which, as stated above, apply only to "employees on traveling gangs who are assigned to work away from home."

Because the plain language of the CN LOA and the 2022 National Agreement demonstrate that the travel allowances provided under the CN LOA apply only to employees on traveling gangs or whose work otherwise requires them to stay overnight in carrier provided lodging, there is no need for the Court to look at the parties' bargaining history as the Seventh Circuit did in *BMWE v. ATSF*. Nonetheless, that bargaining history is instructive, and further supports Plaintiffs' position. It is undisputed that the CN LOA and the 2022 National Agreement were intended to implement the recommendations of PEB 250, which adopted BMWED's proposals. In its report, PEB 250 recounted the rationale offered by BMWED to support its proposal for an increase to the travel allowances and expenses away from home for BMWED members as follows:

> The BMWED asserts that a number of changes have taken place over the years that have contributed to the creation of a problem that needs an immediate solution. Since Award 298, which set national standards in 1967 for travel allowances and expenses away from home, the number of freight railroads has decreased, the territories and seniority units serviced by the traveling gangs have grown in size significantly, and the proportion of work performed by traveling gangs, as opposed to headquartered gangs, has increased significantly. The BMWED maintains that employees are required to travel much greater distances, sometimes as much as 1,000 miles each way, to get to work. It is the Carriers that choose when and where the work is to be performed. Employees should not be expected to have to pay their own way to get to a remote site to perform work. The cost of

8

> traveling is a cost of doing business based upon the business model chosen by the Carriers to have work performed, not some benefit to the employees.
>
> The BMWED maintains that many of its members have to pay hundreds of dollars for which they are not reimbursed fully simply to get from their homes to the work site. Some employees, for example, must drive from Illinois to Nevada to get to work every work cycle and then drive home again. The BMWED provided scores of anecdotes of employees who were forced to sleep in cars, skip food or eat nothing but fast food, sleep in substandard hotels replete with bed bugs and criminal activities taking place on premises, or sleep multiple employees in a room even during the COVID pandemic simply because the Carriers were unwilling to ensure that employees receive fair reimbursements for travel in their personal vehicles and reasonable travel expenses while on the road. The BMWED denies that it is seeking a windfall.

(Ex. A, Sullivan Decl. Ex 1, PEB 250 Report at pp.99-100).

PEB 250 found those arguments persuasive. In its recommendations, PEB 250 explained:

> [T]he evidence provided by the BMWED at the hearing has persuaded the Board that this is a serious problem and a serious inequity. Employees should not be required to pay significant sums of money out of pocket without reimbursement for the privilege of traveling to the often-remote sites where work is to be performed. That is more appropriately a business expense for the Carriers than a burden to be borne by Maintenance of Way employees. … [I]t is apparent from the BMWED presentation that a significant number of employees are currently required to pay expenses out of pocket without full reimbursement in order to travel to the location chose for the gang's work. The fact that employees remain willing to work these jobs even if they have to pay for some of their own travel expenses is not a justification for prolonging this inequity.

(Ex. A, Sullivan Decl. Ex 1, PEB 250 Report at p.103). Thus, it is clear that BMWED's proposals and PEB 250's recommendations were focused on providing lodging and reimbursement for travel expenses for employees on traveling gangs who were required to stay overnight away from home, often at a great distance. PEB 250 did not recommend those same benefits for employees who start and end the day at home.

9

Furthermore, the parties' bargaining history with respect to the CN LOA itself supports Plaintiffs' position. As described in Plaintiffs' Statement of Material Facts, the parties met and reached a tentative agreement on travel allowances for employees who choose to forego the lodging and travel expense reimbursement provided in the 2022 National Agreement on September 23, 2022. (Pls' Stmt. of Facts ¶ 14). In advance of that meeting, Plaintiffs' Director – U.S. Labor Relations, Thomas Sullivan made clear that the Plaintiffs would "not agree to pay a travel allowance or per diem to an employee who does not travel away from home." (Pls' Stmt. of Facts ¶ 16). When asked to clarify that statement, Mr. Sullivan replied, "The expense and travel provisions apply to production gangs. Those individuals that travel to a site and are provided lodging by the Company. What I meant by 'does not travel away from home', is an individual who does not spend the night at a hotel (i.e. starts and ends the day at home)." (Pls' Stmt. of Facts ¶ 17).

Then, after the parties' September 23rd meeting, Mr. Sullivan provided BMWED representatives with a draft agreement, which included language in paragraph 3 tying the travel allowances to employees covered by the 2022 National Agreement. (Pls' Stmt. of Facts ¶ 18). BMWED General Chairman Letizia made a counter-proposal that struck out that language and proposed expanding the scope of the agreement to cover all "Mobile employees who choose to drive home and forego overnight lodging." (Pls' Stmt. of Facts ¶ 20). That counter-proposal was rejected, and the final version of the CN LOA retains the language in Plaintiffs' original proposal that limits eligibility for a travel allowance to employees covered by the 2022 National Agreement. (Pls' Stmt. of Facts ¶¶ 23-24).

In short, Plaintiffs' position that the CN LOA provides travel allowances and mileage only for employees assigned to traveling gangs or who are otherwise required to stay overnight in

10

Carrier-provided lodging and who forego that lodging and the meals and incidental per diem provided under the 2022 National Agreement is strongly supported by both the plain language of the agreements and the relevant bargaining history.

By contrast, BMWED's position would read key provisions in the CN LOA out of the agreement, and would be contrary to the arguments the Union advanced before PEB 250. BMWED seizes on the last sentence of paragraph 2 of the CN LOA, which reads, "These CN employees are currently classified as 'Mobile'," to argue that the agreement provides travel allowances and mileage to all employees without a fixed headquarters reporting location, even if they start and end the day at home, since those employees are also referred to as "mobile" under BMWED's agreements with some of the Plaintiff railroads. That argument simply ignores the first sentence in Paragraph 2, which specifically limits application of the CN LOA to "employees who work on traveling gangs or perform work that requires staying overnight in a lodging facility." If the CN LOA applied as broadly as BMWED argues, that sentence would not be in the agreement. Moreover, BMWED's argument also ignores the language in paragraph 3 of the CN LOA that expressly ties the category of "mobile employees" to the group of employees covered by the 2022 National Agreement, which again is limited to employees on traveling gangs who are assigned to work away from home.

Finally, the fact that BMWED has filed claims under the parties' agreements seeking payment of travel allowances for employees they argue should receive them further supports the conclusion that this case involves a minor dispute that belongs in arbitration. (Pls' Stmt. of Facts ¶ 31). While BMWED has hedged its bets, and included a letter with those claims purporting to state that the only reason for submitting the claim is to prevent a time limits argument should the court decide this case involves a minor dispute, the fact that the Union has initiated the grievance

11

and arbitration process at least tacitly recognizes that the proper forum for resolving this dispute is the mandatory arbitration procedure under Section 3 of the RLA. At the very least, the fact that the Union has chosen to pursue both litigation and the claims process reflects an acknowledgment of the very light burden Plaintiffs bear in demonstrating that this case is a minor dispute.

In sum, this case unquestionably involves a minor dispute under the RLA. As demonstrated above, Plaintiffs can easily articulate a non-frivolous interpretation of the CN LOA and the 2022 National Agreement to support their position. Having done so, "the court lacks jurisdiction to do anything but dismiss the case and allow arbitration to go forward." *BLET GCA UP*, 988 F.3d at 413; *BLET v. UP*, 879 F.3d at 758.

IV. CONCLUSION

For all of the foregoing reasons, Plaintiffs respectfully request that the Court grant their Motion for Summary Judgment, deny BMWED's Motion for Summary Judgment, and issue an order declaring that this case involves a minor dispute that must be resolved in arbitration.

Dated: April 21, 2023

Respectfully submitted,

 /s/ Andrew J. Rolfes
ANDREW J. ROLFES (*pro hac vice*)
ROBERT S. HAWKINS *(pro hac vice)*
COZEN O'CONNOR
1650 Market Street, Suite 2800
Philadelphia, PA 19103
(215)665-2177 (phone)
(215)717-9535 (fax)
arolfes@cozen.com
rhawkins@cozen.com


JEREMY J. GLENN
BRITTANY GREEN
COZEN O'CONNOR
123 North Wacker Drive, Suite 1800
Chicago, IL 60606

(312)474-7981 (phone)
(312) 382-3117 (phone)
(312)706-9791 (fax)
jglenn@cozen.com
brittanygreen@cozen.com

Counsel for Wisconsin Central Limited, Illinois Central Railroad Company, Grand Trunk Western Railroad Company, Chicago Central & Pacific Railroad Company and Bessemer and Lake Erie Railroad Company

13

## CERTIFICATE OF SERVICE

I, Andrew J. Rolfes, hereby certify that on this 21st day of April, 2023, I caused a true and correct copy of the foregoing Memorandum of Law in Support of Plaintiffs' Motion for Summary Judgment to be served upon all counsel of record via the Court's electronic filing system.

>    */s/ Andrew J. Rolfes*
>    ANDREW J. ROLFES

LEGAL\63007086\1